UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| ) | |
| v.          ) | Case Number: 2:15-cr-00031-JHE |
| ) | |
| ) | |
| DENNIS SHEPHEARD,        ) | |

**MEMORANDUM OPINION AND ORDER**

On June 8, 2015, this action came before the Court for trial. Special Assistant United States Attorney Erica Barnes, prosecuted the action for the government, and Assistant Federal Public Defenders Allison Case, Kevin L. Butler, and Deanna L. Oswald represented Defendant Dennis Shepheard. After the conclusion of testimony and argument, the Court took this matter under advisement and provided the parties an opportunity to submit additional briefing on the elements of the applicable statute.

**FACTS**[1]

The evidence establishes the following:

**A. The Uncharged 2012 Incidents**

In May of 2012, the defendant called Veterans Affairs ("VA") about a complaint he had about one of the administrative staff, a scheduling clerk, who he believed did not understand what she was supposed to do concerning the scheduling of an appointment.[2]

---

[1] As the defendant requested at trial, the Court is providing a statement of its specific findings of fact under Rule 23, FED. R. CRIM. P. These facts, however, are not intended as a complete statement of all the evidence presented at trial.

[2] Evidence of the May 2012 conduct was admitted under Federal Rule of Evidence 404(b). After hearing the evidence, the undersigned found the uncharged conduct from 2012 was similar in nature to, and relevant to the defendant's intent on, the charged

1

The defendant was referred to Deborah Glenn, Administrative Officer in the Patient Care Services Department and a supervisor for that staff person. The defendant expressed his concerns, and Glenn explained that that particular staff person was new in her role and was in the process of training. In response, the defendant asserted this was a systemic problem in the VA and she should not just give him an answer to appease him. The call lasted for at least an hour, in which time Glenn explained she was not in a position to make systemic changes but offered to pass his concerns to her superiors. The defendant called back the next day, and Glenn explained she had addressed his issues to the extent she was able and could do nothing else for him. The defendant became very loud over the phone. He continued to call repeatedly, to the point Glenn stopped answering the calls and contacted security. In the end, he called seventeen times over two days. Glenn testified the calls frustrated her and made it hard to focus on her work. During one of the conversation with Glenn, the defendant asked her who her supervisor was and she referred him to Cynthia Frazier. At that point, the defendant started calling Frazier.

Cynthia Frazier is a Nurse Manager over several areas at the Birmingham VA hospital. During the initial call with Frazier, the defendant identified himself as Dennis Shepheard. Frazier again referred him to Glenn on the issue with the staff member but attempted to assist the defendant with the underlying issue by rescheduling his appointment to an earlier date closer to what he had expected. This call lasted forty-five minutes and Frazier believed she had solved the problem. However, the defendant

---

conduct occurring in 2014 and 2015. Contrary to the defendant's arguments, the undersigned did not find the evidence so prejudicial as to outweigh its probative value under Rule 403.

continued to call and complain about the VA system generally. Frazier estimated the defendant made hundreds upon hundreds of calls after the initial call and that she spoke with him at least four or five times. In addition to referring him to Glenn, Frazier also referred the defendant to the patient advocate and told him the VA was working on improving its system. She told him there was nothing else she personally could do for him, and, in response, the calls became more demanding and forceful until Frazier felt threatened.

The defendant continued to call both Frazier's office and the dialysis unit over about a two week period, until Frazier notified Deputy Chief of Police Floyd Walfield of the frequent call's negative effects on the dialysis unit's ability to meet patient needs. The calls stopped after Walfield and Chief Nurse, Greg Eagerton, got involved. Eagerton acknowledged his concern and apologized for issue with the staff person, and the defendant testified that, after someone acknowledges the problem and make a commitment to address it, he has done all he can do. The defendant made no further calls regarding this issue.

### B. The 2014-2015 Incidents

On December 19, 2014, the defendant called the Birmingham VA hospital about his travel pay and was transferred to Amy Ho, a voucher auditor at the hospital. He introduced himself and asked when his travel pay was processed. Ho told him his payment had been processed that morning and would be made by direct deposit instead of by check. The defendant became upset, asking how the VA had gotten his banking information. Ho informed him the VA had done a one-time match in 2012 for veterans

who got travel pay.³ The defendant became more upset and began to cuss. She offered to have his information removed, but he declined, asking to speak with the privacy officer. Ho transferred him to privacy officer, Kim Moses. Later that day, the phone rang several more time with the Caller ID showing "Local 1." Ho testified she did not frequently receive calls from "Local 1," but that is what came up each time the defendant called. She did not answer any other calls that day.

The defendant called again the following Monday. Ho asked him how she could help him, and he said she could answer his question. She responded that she had answered his question and there was nothing else she could do. When he started cussing again, she informed him she would disconnect the call if he continued. He did, and she ended the call. He called her thirty-eight times over the rest of the day.

Ho spoke with the defendant again on December 24, 2014. The first thing he told her was that he could do this all day long. She asked how she could help him, and he said she could answer his question. She said again that she had answered his question and there was nothing else she could do. When he began to cuss again, she gave him another warning. She asked him how she could help him, and he told her to answer his question. When she told him she had, he said he could care less if she went to hell, and she disconnected the call.

Due to the large number of calls from the defendant, Ho was unable to answer some calls from veterans and was forced to turn the volume down on her phone whenever she left her desk, preventing others from answering her phone for her.

---

³ Amy Ho testified the VA had gone cashless and the Veterans Health Administration ("VHA") did a one-time match with the Veterans Benefits Administration ("VBA") to acquire banking information for veterans receiving travel pay.

In December 2014, the defendant also made calls to Libby McElroy, which were fielded by her Administrative Support Assistance Teresa Lewis. When he called, he would introduce himself as Dennis Shepheard and ask for Assistant Chief Libby McElroy[4]. McElroy was not available so Lewis would take a message or transfer him to McElroy's voicemail. He called repeatedly all during the day every day. If Lewis did not answer or transferred him to voicemail, he would call right back. When Lewis asked him why he was calling so much, he said he wanted to speak to McElroy and was upset she was not returning his calls despite several messages. He accused Lewis of not giving McElroy his messages.

Lewis kept a record of some of the calls. On January 5, 2015, she logged twenty-eight calls from Defendant, minutes apart. The next day, she logged sixteen, also minutes apart. On January 9, 2015, she logged seven calls in an hour and fifteen minute period. Another day in January, she logged ten calls in a fifteen minute period. Lewis testified she did not log every call or log calls every day, and she did not answer every call. The defendant, however, called from the same number every time, which showed up on the Caller ID. Lewis testified the frequent calls stressed her out and, when other patients could get through on the line, made it difficult for her to help them. Sometimes she would ask her boss to allow her to work at a different station because she could not take the calls anymore.

Occasionally, the defendant would reach Tinya Lee, a Medical Records Specialist, who also served as a back-up for answering phones in the business office at the Birmingham VA hospital. The defendant would introduce himself and ask for McElroy,

---

[4] Libby McElroy is the Assistant Chief of the Birmingham VA business office.

and Lee would take his message verbally or by handwritten note. Sometimes, the defendant would be so upset she could not understand what he was saying. He called repeatedly, back to back, every time Lee worked the phones, creating interruptions that made it difficult to do other work.

During this time, McElroy became aware the defendant was trying to reach her, but she did not answer his calls. She testified she did not answer because Kim Moses had made her aware of his issue already, she knew he had already been given the information he sought and there was nothing more she could do for him, and, from past conversations with him, she knew it would be an unproductive, unpleasant conversation and did not want to experience it again.

VA Deputy Chief of Police Walfield also instructed her not to take the defendant's calls and to have them transferred to him. At least fifty to sixty of the defendant's calls were transferred to Walfield's desk between December 2014 and February 2015. When Walfield received the calls, he told the defendant to stop making repetitive calls so the offices could get their work done. During one of the intercepted calls, Walfield told the defendant that, if he did not stop calling, he would have to suffer the consequences and probably have to appear in court. The defendant said that was fine, that Walfield should do what he had to do and the defendant would do what he had to do.

On January 21, 2015, however, McElroy spoke with the defendant in a recorded conversation with Walfield on the line. She and the defendant discussed his issue with the banking information, explaining the regulation requiring all federal non-tax payments be made electronically by March 1, 2013, which prompted the VHA to get veterans' banking information from the VBA. She told him this was the only information she had to give

him, but he was not satisfied with her answer, saying she was not answering his question, that he wanted to know by what authority they had acted. She asked him to restate his question in case she misunderstood, and he stated he was not asking if it would be easier to follow the instructions for electronic transfer but wanted to know by what authority they had gotten the banking information from the VBA. She repeated that the information she had given him was all she had and that apparently she could not help him. He asked her if she actually believed her not answering him was going to make him stop calling. She repeated that she could not help him and the business office could not help him and told him to put his complaint in writing so he could get a written response, and, if there were any appeal rights, he would get them then. He was not satisfied with that solution. She told him she was not going to be able to help him and would end the call. He asked her sarcastically if she thought that meant he would be gone, that he would be done. As he got even more upset, raising his voice and cussing, she ended the call. After this conversation, the defendant continued calling McElroy and her office.

Walfield made one call to the defendant directly to tell him to stop making repetitive calls or he would get a citation. The defendant did not stop making the calls, and a citation was issued. The defendant continued making calls after the citation was issued up until the day he was arrested.

The defendant testified he kept calling even after it was clear they had nothing more to say to him because the VA was moving veterans' information around without their knowledge and against their wishes and he felt he had not only a personal responsibility to get to the bottom of it for himself but also a responsibility to other veterans who might be affected. He had had experience with lost data and described it as

arrogance the way the VA employees had taken charge of his life and, likely, the lives of other veterans' families by relying on this regulation as though that should be good enough for him.

## DISCUSSION

The United States argues the evidence established beyond a reasonable doubt the defendant made harassing communications, as charged in the information, in violation of Ala. Code § 13A-11-8.[5]  The defendant contends the government has not met its burden of proof on the element of intent or that he was not making legitimate business communications.

> A person makes harassing communications under Alabama law
>
> if, with intent to harass or alarm another person, he or she does any of the following:
>
>> a. Communicates with a person, anonymously or otherwise, by telephone, telegraph, mail, or any other form of written or electronic communication, in a manner likely to harass or cause alarm.
>>
>> b. Makes a telephone call, whether or not a conversation ensues, with no purpose of legitimate communication.
>>
>> c. Telephones another person and addresses to or about such other person any lewd or obscene words or language.

Ala. Code § 13A-11-8(b)(1).  That provision also states that "[n]othing in this section shall apply to legitimate business telephone communications." *Id.*

The government contends it proved facts beyond a reasonable doubt to support findings of intent to harass or alarm and of all three of the alternative subsections.  The government, however, did not present any evidence of lewd or obscene language.

---

[5] The defendant stipulated to the existence of a federal jurisdiction nexus because the events occurred on federal property.

Although there was considerable testimony the defendant "cussed" or "cursed" at the VA employees, there was no evidence of what the actual language used was and whether any of it was lewd or obscene. The only profanity in the record was the defendant's use of "damn" in the recorded conversation and "hell" in a conversation with Amy Ho. (See Def. Ex 1). Neither of those is lewd or obscene. Therefore, the question is whether the evidence the government presented proves the defendant intended to harass or alarm another person and either communicated by telephone in a manner likely to harass or cause alarm or made calls with no purpose of legitimate communication.

    A. **Intent to Harass or Alarm**

First, the government must prove beyond a reasonable doubt that the defendant intended to harass or alarm another person. Although "harass" is not defined in the statute, both the government and the defendant rely on the statutory definition of "harasses," as it is defined for purposes of the Alabama stalking statute. (Doc. 31 at 2 n.1; doc. 32 at 3) (both citing Ala. Code § 13A-6-92(c)). That provision states a person "harasses" someone when he "[e]ngages in an intentional course of conduct directed at a specified person which alarms or annoys that person . . . , and which serves no legitimate purpose," and "[t]he course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress." Ala. Code § 13A-6-92(c).

The two sides part ways, however, when interpreting that statute in the context of the phrase "intent to harass." Relying on federal court interpretations of the federal stalking statute, the defendant contends he must have intended to cause another person to suffer substantial emotional distress. (Doc. 31 at 2 and 2 n.1) (citing *United States v.*

9

*Infante*, 782 F. Supp. 2d 815, 820 (D. Ariz. 2010), and *United States v. Tobin*, 545 F. Supp. 2d 189 (D.N.H. 2010)). The government asserts those cases were interpreting a statute with different language and that, under the Alabama Supreme Court's interpretation of the state statute, the requirement is only to intentionally engage in conduct one knows would cause a reasonable person to suffer substantial emotional distress. (Doc. 32 at 3) (citing *Hayes v. State*, 717 S. 2d 30, 33 (Ala. 1997).

However, the definition section of the stalking section was enacted fourteen years after the harassing communications statute's use of "harass," *see* Ala. Code § 13A-11-8, *Commentary* (noting harassing communications subsection was added in 1978); Ala. Code § 13A-6-92 (enacted in 1992), and it explicitly states it only applies to that section, *see* Ala. Code § 13A-6-92 ("*As used in this article*, the following terms shall have the following meanings . . . ."). When interpreting the term "alarm" in § 13A-11-8(b)(1), the Alabama Court of Criminal Appeals relied on *Merriam-Webster's Collegiate Dictionary*, stating, "When a term is not defined in a statute, the commonly accepted definition of the term should be applied." *City of Montgomery v. Zgouvas*, 953 So. 2d 434, 442-43 (Ala. Ct. Crim. App. 2006) (quoting *Ex parte Gadsden Reg'l Med. Ctr.*, 904 So. 2d 234, 236 (Ala. 2004)) (internal quotation marks omitted). *Merriam-Webster's Online Dictionary* provides the following reasonably applicable definitions of "harass": "to annoy persistently" or "to create an unpleasant or hostile situation for especially by uninvited and unwelcome verbal or physical conduct." "Harass," *Merriam-Webster Online Dictionary* (2015), http://www.merriam-webster.com/dictionary/harass.

Regardless, in the end, the evidence supports the finding under all three definitions. The defendant's conduct shows he intended to annoy the VA employees and

create an unpleasant or hostile situation for them through unwelcome conduct and he intended that conduct to cause substantial emotional distress for them.

First, this intent can be inferred from the repeated calls after being told he could not obtain the information he sought from those phone numbers. *See, e.g.*, *Donley v. City of Mountain Brook*, 429 So. 2d 603, 615 (Ala. Ct. Crim. App. 1982) ("[D]ue to the repetition of appellant's calls, he intended to harass [the victim] as is alleged in the complaint. No one besides [the victim] answered the nine telephone calls made by appellant on the date in question and yet he persisted in calling."), *rev'd on other grounds sub nom.*, *Ex parte Donley*, 429 So. 2d 618 (Ala. 1983). In addition, his intent becomes particularly clear in certain statements he made to Amy Ho in December 2014 (telling her as soon as she answered the phone that he could do this all day), Floyd Walfield in 2015 (telling him the defendant was going to do what he had to do) and Libby McElroy during their conversation on January 21, 2015 (when he asked her if she actually believed her not answering him was going to make him stop calling and if she thought her ending the call meant he would be gone, that he would be done).

Although the defendant undoubtedly made his first calls to each person with a legitimate business purpose, once it became clear to him he would not get an answer he felt was satisfactory from people he believed had the information he sought, his calls transitioned from that legitimate business purpose into harassment intended to wear the employees down emotionally until they gave him the information. The defendant made dozens of calls in a day to the same number even after being told the person he sought was not available or the people at those numbers could not answer the questions he posed any other way than they had already been answered. Even if the underlying motivation of

obtaining the information he sought on behalf of himself and other veterans was still there, he clearly intended the intervening calls (between his initial call and some potential future call in which someone would give him the answer he wanted) to cause sufficient annoyance and emotional distress to the VA employees that they would give him that answer.

The undersigned finds the government has proven beyond a reasonable doubt that the defendant intended to harass the VA employees he repeatedly called in December of 2014 and January and February of 2015.

### B.  The Alternative Elements

The government must also prove beyond a reasonable doubt that the defendant either communicated with the VA employees "in a manner likely to harass or cause alarm" or made the phone calls "with no purpose of legitimate communication."  Ala. Code § 13A-11-8(b)(1)(a) & (b).

As previously noted, testimony shows the defendant made dozens of calls to the same number, often back to back or with only minutes in between calls.  He had already been told when he made the subsequent calls he would not be able to reach the person he sought or would not get a different answer than the one already provided so there could have been no purpose of legitimate communication for those calls.  They were, as discussed above, a tactic to wear down the people he thought were stonewalling him.  As a result, the government has proven beyond a reasonable doubt that the defendant made telephone calls without a purpose of legitimate communication.

The government also presented evidence establishing the defendant communicated with several VA employees in a manner likely to harass or alarm.  Defendant

communicated with Amy Ho on at least three occasions in 2014, in which he would ask the same question and, when she did not give him the answer he wanted, ask the same question again or start cussing. He also communicated on multiple occasions with Tinya Lee between December 2014 and February 2015, repeatedly asking her for the same thing and sometimes getting so upset she could not understand him. Both instances show communication in a manner likely to cause alarm or substantial emotional distress.

The undersigned finds the government has proven beyond a reasonable doubt that the defendant made telephone calls to VA employees in December of 2014 and January and February of 2015 without a purpose of legitimate communication[6] and he communicated with VA employees in December 2014 and January and February of 2015 in a manner likely to harass or cause alarm.[7]

## CONCLUSION

---

[6] The defendant contends the language of the statute, stating it does not apply to legitimate business telephone communications, means the government must prove beyond a reasonable doubt his communications were not legitimate business telephone communications. (Doc. 31 at 2). The government argues the provision is a constitutional safeguard, not an element of the crime, and does not need to be proven beyond a reasonable doubt but, regardless, it has done so. (Doc. 32 at 2-3). The undersigned has already found Defendant made repeated calls without a purpose of legitimate communication and that every call he made after being told that person could not do anything about his repeated requests was intended not as a legitimate business communication but a harassing tactic to get his way. Defendant's conduct used to establish the elements of the crime were not legitimate business telephone communications.

[7] Defendant contends he cannot be convicted based on the content of his communications unless the government proves the speech falls into one of the traditional First Amendment exceptions. (Doc. 31 at 3). In *South v. City of Mountain Brook*, 688 So. 2d 292 (Ala. Ct. Crim. App. 1996), the Alabama Court of Criminal Appeals noted that what the Harassing Communications statute criminalizes is "the manner used which intrudes on an individual's right to be left alone and not the thoughts or ideas conveyed." *Id.* at 296 (quoting *Yates v. Com.*, 753 S.W.2d 874, 876 (Ky. Ct. App. 1988)). The content of Defendant's communication is not being criminalized, but it is his imposition of unwelcome communication onto others in a private setting with the intent to harass or alarm them that constitutes the crime.

Based on the foregoing, the Court finds the Defendant guilty as charged in Counts One and Two of the information. Sentencing in this matter will be set by separate order.

**DONE** and **ORDERED** on June 24, 2015.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE